[No. 1931.]

THE JOHN G. MORGAN BROKERAGE COMPANY v. SHEM-
WELL.

1. GAMING CONTRACTS—BUCKET SHOPS—MONEY HAD AND RECEIVED
—BURDEN OF PROOF.

An action wherein plaintiff seeks to recover from defendant, a broker-
age company commonly denominated a "bucket shop," a certain
sum of money which plaintiff alleges she deposited with her hus-
band to be kept for her and which without her consent he gambled
away to defendant, betting upon the market price of certain grains,
provisions and corporate stocks, is in reality an action for money
had and received, the theory of which is that defendant has plain-
tiff's money without her consent and without having parted with
any consideration therefor, and the burden is upon plaintiff to
show that the money in question belonged to her, that it was se-
cured by defendant without her consent and without giving any
valid consideration therefor.

2. SAME—EVIDENCE.

In an action wherein plaintiff seeks to recover from defendant a certain
sum of money which she alleges she deposited with her husband
and which he gambled away to defendant, betting on the market
price of certain grains, produce and corporate stocks, where the
evidence shows that defendant paid back to the husband more
money than was received from him, the evidence is insufficient to
sustain plaintiff's case and it is unnecessary to determine whether
or not the contracts upon which the money was alleged to have
been received by defendant were valid or invalid.

*Appeal from the District Court of El Paso County.*

Messrs. PATTISON, WALDRON & DEVINE, for appellant.

Mr. H. McGARRY, for appellee.

WILSON, J.

The allegations of the complaint are substantially to the ef-
fect:

1. That during the time complained of, the defendant com-
pany was conducting at Colorado Springs an illegitimate busi-

ness commonly known and denominated a "bucket shop" business, by gambling with its customers upon what are commonly designated as margins of the general market price of the country, of grain, provisions and corporate stocks; and wagering and gambling with its customers upon the rise and fall of the price of such commodities, as is shown from time to time by the general market price of such commodities, arising from what are commonly known as the leading stock exchanges of the country.

2. That on the 1st day of January, 1897, plaintiff deposited with one James Shemwell, who was her husband, the sum of $900, the separate property of plaintiff, for safekeeping, to be invested by said James Shemwell only under the direction of plaintiff, or to be returned to her on demand.

3. That thereafter, without the knowledge or consent of plaintiff, said James Shemwell deposited said sum with the defendant, under wagering and gambling contracts entered into between him and the defendant, to the effect that if the fluctuations in rise and fall of the general market prices of certain grains, provisions, or corporate stocks (particularly unknown to plaintiff), as shown by the reports of the same arising from the leading stock exchanges herein above mentioned, assumed a certain condition, that the defendant should retain said money as a winning by it from said James Shemwell, according to the terms of said gambling contracts, and that thereafter such transactions by and between said James Shemwell and the defendant by said gambling contracts, that the defendant did have, receive and keep from the said James Shemwell the said sum of money as having won it from him, according to the terms of said gambling contracts.

The answer contained a specific denial of each of the material allegations in the complaint, and also set up as a separate defense that an accounting had been had between the defendant and the said James Shemwell, by which all transactions of every name and nature were finally settled and adjusted between them. Verdict and judgment were in favor of the plaintiff, and the defendant appeals.

Counsel in their briefs have elaborately and ably discussed the nature and character of the contracts, and all transactions between the defendant and James Shemwell, from which this controversy arises, but as we view the case, we are entirely relieved from the necessity of considering this question. The determination of the appeal does not depend upon whether they were wagering and gambling contracts or legitimate business transactions, whether they were enforcible or nonenforcible, valid or invalid. The obvious theory upon which the plaintiff seeks to recover, is that the defendant had her money without her consent, and without having parted with any consideration therefor. It is in reality a suit for money had and received, and must be governed by the legal principles applicable to such class of cases. To sustain it, it must appear that the money in question was owned by the plaintiff, that it was secured by defendant without her consent and without giving any valid consideration therefor. The burden is of course upon the plaintiff, as in other cases, to show these fundamental and essential facts by a preponderance of evidence. Having so shown them, the plaintiff would be entitled to recover, unless it should appear to the court from the special facts of the particular case that there were sufficient acts of ratification by plaintiff, or that in equity and good conscience, the defendant ought and was entitled to retain the money. Wait, Actions and Defenses, vol. 4, p. 511. The principal witness for plaintiff, and in fact, the only one who testified to the material facts incumbent upon plaintiff to prove, was James Shemwell. His testimony was indefinite, uncertain and absolutely contradictory in essential particulars. The transactions in which the money of plaintiff was alleged to have been lost, took place during the month of December, 1896, and the months of January and February, 1897. Shemwell testified at one time that during December and up to January 6, he had put up with the defendant company of his own money about $2,200 or $2,250. At another time, he testified that he did not invest with defendant any money except that of his

wife, during December, January and February. Now, if he received only $900, from his wife, which she alleges to have been the case, we fail to see how he could have invested $2,200 of her money during that time. It further appears that the greater part of these transactions took place in January and February, after January 6. There was some testimony to the effect that Shemwell had invested some of his own money prior to the investment of his wife's but neither the times nor the amounts of such investments are given, so that if any such were made, they cannot be distinguished from the transactions in which he invested his wife's money. This is highly important, in view of the fact that it was shown on the trial, and was undisputed, that during the months of December, January and February, the defendant paid to James Shemwell the sum of $3,370.80. This was paid at various times between December 1st and February 15th, through the medium of numerous checks upon bank given by defendant, and which were cashed by Shemwell, except that upon one occasion, $140 was paid to him in cash, and at one other time, one check was executed directly to the plaintiff. Now conceeding that Shemwell invested with defendant $2,250, in addition to the $900 claimed to have belonged to his wife, it appears that he received back from defendant about $220 more than he had paid to it. If this were the case, and we can see no other conclusion from the testimony, plaintiff was of course not entitled to recover, whatever may have been the character or nature of the contracts under which Shemwell invested her money with defendant. This is immaterial. If he received the money back, the plaintiff of course has not suffered any damage from defendant.

There was an apparent attempt to explain this, as appears from the following extract from Shemwell's testimony:

" Q. Is it not a fact that the money represented by these checks represent the different transactions taking place on the different days ?

" A. Yes, sir.

" Q. And outside of that trade on that day you got the

check the proceeds were reinvested in the same way in another deal?

" A. Yes, sir.

" Q. It is practically the same money, used on different days ?

" A. Yes, sir."

This was the entire testimony bearing upon this point, and we do not think that it at all explains the evident discrepancy to which we have alluded.    Especially is this true in view of the fact that it appears from the testimony to have been the custom of the defendant to issue to a customer in every transaction a printed memorandum of the contract.    That such was the fact we gather from Shemwell's testimony.    Only six of these were offered in evidence, covering transactions in January and February only, and showing an investment by Shemwell of less than $500, whereas it is undisputed from the testimony that Shemwell received from defendant during said two months checks for the amount of $2,289.    Counsel for plaintiff contends that he was not suing upon these contracts, and those introduced were simply to show the character of the transactions wherein the money was alleged to have been lost.    This may be true, but they would certainly have been important as evidence to have shown that Shemwell did make these numerous investments, as claimed.

Again, the complaint alleges that plaintiff's money was given to Shemwell on January 1, 1897, and was lost by him thereafter.    Now the only transactions definitely shown to have taken place between Shemwell and the defendant after January 1st, were the six, the printed memoranda of which were offered in evidence, and in these it appears that Shemwell invested only $460, whereas during the same time, he received from defendant a very much larger sum.    We think that the evidence was wholly insufficient to have sustained the verdict or the judgment.    Great weight of course should be given to the verdict of a jury, upon the theory that where the evidence is conflicting, they are the best judges of the credibility to be attached to the witnesses who appear and

testify before them, but it is equally well settled that a verdict cannot be permitted to stand if there is not sufficient evidence to support it. Such we believe to be the case here, upon consideration alone of the evidence offered in behalf of the plaintiff, without reference to that given for the defendant.

For this reason alone, without expressing or intimating any opinion as to the character of the contracts in question, the judgment will be reversed.

*Reversed.*